Dolores M. KEDRA, in her own right, Richard J. Rozanski and Elizabeth Rozanski, Husband and Wife, Patricia Kedra, Kenneth Kedra, Teresa Kedra, Michael Kedra, a minor, by his parent and natural guardian Dolores M. Kedra, Robert Kedra, a minor, by his parent and natural guardian Dolores M. Kedra, and James Kedra, a minor, by his parent and natural guardian Dolores M. Kedra

v.

CITY OF PHILADELPHIA, Joseph F. O'NEILL, Police Commissioner of the City of Philadelphia, Joseph Golden, Chief Inspector, Homicide Division of the Police Department of the City of Philadelphia, Captain Donald Patterson, Lieutenant Lesley Simmins, Lieutenant Augustus Miller, Sergeant John Tiers, Detective Richard Strohm, Detective James Richardson, Detective George Cassidy, Detective Michael Gannon, Officer James Brady, Officer Robert Pitney, Officer Jessie Vassor, Officer John J. D'Amico, Officer (first name unknown) Tuffo, and other unidentified members of the Philadelphia Police Department.

Civ. A. No. 77–4046.

United States District Court, E. D. Pennsylvania.

June 29, 1978.

Jack E. Feinberg, Ronald A. Blumfeld, Philadelphia, Pa., for plaintiffs.

Gerald T. Clark, Asst. City Sol., Philadelphia, Pa., for defendants.

## OPINION

LUONGO, District Judge.

This civil rights action arises out of an alleged series of brutal acts committed by Philadelphia policemen against the plaintiffs. The events set forth in the complaint span one and one-half years, from December 1975 to February or March 1977. The defendants have moved to dismiss. *See* Fed.R.Civ.P. 12(b).

### I. *The Factual Allegations*

Plaintiffs are Dolores M. Kedra; her children, Elizabeth, Patricia, Teresa, Kenneth, Joseph,[1] Michael, Robert, and James; and Elizabeth's husband, Richard J. Rozanski. Michael, Robert, and James Kedra are minors, and their mother sues on their behalf as parent and natural guardian.

Defendants are the City of Philadelphia; Police Commissioner Joseph J. O'Neill; officials of the Police Department's Homicide Division—Division Chief Donald Patterson, Chief Inspector Joseph Golden, Lieutenant Leslie Simmins, and Sergeant John Tiers; Homicide Detectives Richard Strohm, James Richardson, George Cassidy, and Michael Gannon; Police Lieutenant Augustus C. Miller; Police Officers James Brady, Robert Pitney, Jessie Vassor, and John J. D'Amico; an officer surnamed Tuffo; and other unidentified members of the Police Department. It is alleged that "at all times material to plaintiffs' cause of action [the City of Philadelphia] employed all of the

1. Joseph Kedra is named as a plaintiff in the body of the complaint but not in the caption. This oversight violated federal pleading rules (*see* Fed.R.Civ.P. 10(a); *Carrigan v. California* *State Legislature*, 263 F.2d 560, 567 (9th Cir.), *cert. denied*, 359 U.S. 980, 79 S.Ct. 901, 3 L.Ed.2d 929 (1959)) and should be corrected by amendment.

individual defendants." It is further alleged that each of the individual defendants, "separately and in concert," acted under color of Pennsylvania law and, "pursuant to their authority as agents, servants, and employees of defendant City of Philadelphia, intentionally and deliberately engaged in the unlawful conduct described . . .." They are sued "individually and in their official capacity" and "jointly and severally."

The series of events set forth in the complaint[2] dates from December 22, 1975. On that evening, Richard Rozanski and Joseph and Michael Kedra were arrested at gun point without probable cause by defendants Vassor and D'Amico and taken to Philadelphia Police Headquarters (the Roundhouse). At the Roundhouse, they were separated and questioned for seventeen hours by defendants Strohm, Richardson, Cassidy, and Gannon. They were not informed of their constitutional rights and were refused requests for counsel. The complaint states—

"During the course of the interrogation, plaintiffs Richard Rozanski, Michael Kedra and Joseph Kedra were handcuffed, struck about the head, face, stomach, abdomen, arms and legs with fists and physical objects, were harassed and threatened with further physical violence by defendants Strohm, Richardson, Cassidy and Gannon; during the course of this interrogation, plaintiff Richard Rozanski's legs were held apart by two of the defendant detectives while he was kicked in the testicles, groin, buttocks and legs by defendant Strohm."

Rozanski, and Michael and Joseph Kedra each sustained serious injuries as a result of the beatings.

Meanwhile, defendant Richardson forcibly took Elizabeth Rozanski from her mother's house to the Roundhouse, where she was detained and questioned for seventeen hours by defendants Strohm, Gannon, Richardson, and Simmins. She was not advised of her rights. She was shown her husband, who had been beaten badly, and "was threatened with arrest in an attempt to coerce a false statement from her." A warrantless search of her bedroom was conducted by defendant Strohm "and others" without her consent and without probable cause.

On that same evening, Dolores Kedra voluntarily went to the Roundhouse "where she was illegally interrogated, coerced into signing a release authorizing the search of her house and forcibly detained" for nine hours by Strohm, Richardson, Cassidy, Gannon, "and other unidentified defendants."

Seven days later, on the morning of December 29, 1975, defendants Brady and Pitney went to the Kedra home, demanding to see Richard Rozanski and "falsely stating that they had papers for his appearance in Court on the following day." All of the plaintiffs except Dolores Kedra, the mother, were at home at the time. The policemen "attempted to drag [Rozanski] out of the house," but Rozanski and Kenneth Kedra shut and locked the door. Rozanski asked to see a warrant, but Brady and Pitney did not have one. Brady and Pitney then secured the aid of other policemen who, without a warrant or probable cause and "through the use of excessive force," "broke open the door with the butt end of a shotgun and forced their way into the house with shotguns, handguns, blackjacks, and nightsticks in hand." Defendants Brady, Pitney, Miller, Tiers, "and ten to fifteen other defendant members of the Philadelphia Police Department" conducted a thorough search of the house and, while doing so, physically assaulted Patricia, Joseph, Michael, and Kenneth Kedra, inflicting serious injuries. They also attempted to confiscate a camera and note pad being used by Joseph Kedra. It is alleged further that—

"[T]he defendants unlawfully detained plaintiffs within the house by blocking off both the front and rear doors, holding plaintiffs in fear of life and limb by visibly displaying shotguns, handguns and

---

**2.** The facts related in the text are as alleged in the complaint. For purposes of this motion, those allegations are taken as true. *See Estelle* *v. Gamble,* 429 U.S. 97, 99, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

nightsticks, and through threats of violence, coercion and abusive language."

Rozanski and Joseph, Michael, and Kenneth Kedra were taken to the Roundhouse in a police van, and Kenneth was beaten while being led to the van. At the Roundhouse, Michael and Kenneth were "unlawfully detained" for twenty-four hours, and Rozanski "was struck in the face by defendant Strohm" and was denied repeated requests for counsel. "[W]ithout just or probable cause," Rozanski was charged with murder, burglary, and receiving stolen goods, and Kenneth and Joseph were charged with assault and battery, harboring a fugitive, and resisting arrest. In defending these charges, they incurred attorney's fees. All three later were acquitted on all counts.

With respect to the December 1975 events, the complaint sets forth the following general allegations:

"17. At all times material to plaintiffs' cause of action, plaintiff Richard Rozanski, through his attorney, offered to voluntarily surrender to the Philadelphia Police; the defendants chose, however, to engage in the course of conduct described in detail above, the purpose and effect of which was to knowingly, intentionally and deliberately deprive plaintiffs of rights secured by the Constitution of the United States.

18. All of the' aforementioned acts were committed by defendants intentionally, deliberately and maliciously, pursuant to their authority as agents, servants and employees of the Police Department of the City of Philadelphia.

19. The aforementioned acts were committed with the consent and knowledge and at the direction of defendants Joseph F. O'Neill in his capacity as Police Commissioner of the City of Philadelphia.

20. The aforementioned acts were committed with the knowledge and consent and at the direction of defendant Joseph Golden in his official capacity as Chief Inspector of the Homicide Division of the Police Department of the City of Philadelphia.

21. The aforementioned acts were committed with the knowledge and consent and at the direction of Captain Donald Patterson, Chief of the Homicide Division of the Philadelphia Police Department, Lieutenant Lesley Simmins and Sergeant John Tiers, in their official capacities as supervisory officials of the Philadelphia Police Department.

22. The defendants named in Paragraphs 18, 19, 20 and 21 are and were at all times material to plaintiffs' cause of action in a position to exercise direct supervision of the defendant officers and detectives and did in fact exercise such control and supervision at all times material to plaintiffs' cause of action.

23. All of the aforementioned acts were committed without just or probable cause with regard to each of the plaintiffs."

The complaint alleges further that "defendants have engaged and continue to engage in a systematic pattern of harassment, threats and coercion with the intention of, and having the effect of depriving plaintiffs of . . . rights and privileges . . . ." As part of this "pattern," Michael Kedra was arrested in June 1976 and was beaten by defendant Strohm, "who handcuffed plaintiff's hands behind his back, and struck him in the chest and stomach with a nightstick and fist." James Kedra has been "harassed and threatened without cause" by defendants D'Amico, Brady and Pitney, and in February or March 1977 "was grabbed by the shirt" by Tuffo and Pitney "and threatened with physical violence."

The complaint asserts that "as a result of the aforementioned actions, plaintiffs have suffered and continue to suffer severe emotional distress."

## II. *The Suit and the Motion*

Plaintiffs' complaint was filed on November 23, 1977. The action is brought under the Constitution and the Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1985, 1986. Jurisdiction is based on 28 U.S.C. §§ 1331 and 1343. As a basis for their civil rights

claims, the plaintiffs assert that defendants' actions deprived them of the following federal "rights, privileges and immunities":

"(a) The right of free speech and the right to peacably [*sic*] assemble under the First and Fourteenth Amendments.

(b) The right to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures under the Fourth and Fourteenth Amendments.

(c) The prohibition against compulsory self-incrimination under the Fifth and Fourteenth Amendments.

(d) The right to be free from deprivation of life, liberty or property without due process of law under the Fifth and Fourteenth Amendments.

(e) The prohibition against cruel and unusual punishment under the Eighth and Fourteenth Amendments."

Without explanation, the complaint also cites the Equal Protection Clause of the Fourteenth Amendment and Article 1, §§ 1, 8, and 9 of the Pennsylvania Constitution. Plaintiffs also invoke the pendent jurisdiction doctrine to assert additional claims under Pennsylvania law "for false arrest, false imprisonment, malicious prosecution, assault and battery, trespass to real and personal property and negligent and intentional infliction of emotional distress." Plaintiffs seek compensatory and punitive damages in excess of $10,000 and attorneys' fees and costs.

All of the named defendants have filed the motion to dismiss. It is based on several grounds [3] and raises questions of procedure as well as jurisdictional and substantive issues under the civil rights laws. In addition, the pendent state claims raise jurisdictional issues not discussed in the motion which should be examined in this opinion.

### III. *Procedural Questions*

Defendants' motion raises two matters that essentially are procedural. First, they contest Dolores Kedra's prosecution of the case on behalf of her minor sons, Michael, Robert, and James. Second, they contend that there has been an improper joinder of parties.

### A. *Suit on behalf of the minor children*

■ In the list of plaintiffs in the caption of the complaint, Michael, Robert, and James Kedra are each listed as "a minor, by his parent and natural guardian, DOLORES M. KEDRA." Defendants contend that Dolores Kedra is seeking to assert her children's rights and that she lacks standing to do so. They also argue that, because she asserts no rights of her own with respect to these children's claims, the Court lacks jurisdiction over the claims.

Defendants' contentions on this matter are frivolous. The complaint makes abundantly clear that Michael, Robert, and James are plaintiffs in their own right and that their mother merely is acting as their representative since, as minors, they lack capacity to sue.[4] In light of the allegations

---

**3.** The motion states that the defendants move—

"to Dismiss the Complaint as to each of the Answering Defendants for the following reasons:

1. This Honorable Court has no jurisdiction over the named Defendant, City of Philadelphia, as a matter of law.

2. Plaintiffs have failed to state a claim upon which relief can be granted as the same may relate to Defendants, Joseph F. O'Neill, Joseph Golden and Donald Patterson.

3. This Honorable Court lacks jurisdiction as to the Defendant Police Officers sued in their individual capacity.

4. This Honorable Court lacks subject matter jurisdiction over all Defendants as to

the cause of action of Dolores M. Kedra on behalf of her minor sons.

5. Plaintiff Dolores M. Kedra lacks standing to sue on behalf of her minor sons.

6. The applicable statute of limitations has run.

7. Plaintiff has improperly joined parties named in this suit."

**4.** Under Federal Rule of Civil Procedure 17(b), the capacity of these plaintiffs to sue is determined by the law of Pennsylvania. Under Pennsylvania law, a plaintiff who is a minor (defined as a person under the age of eighteen years) must be represented by a guardian who supervises and controls the action on his behalf. Pa.R.Civ.P. 2027; *see* Pa.R.Civ.P. 76 (definitions of "minor" and "majority"). Defend-

of injury to Michael, Robert, and James, defendants do not, and could not, contend that these minors lack standing. There are no jurisdictional problems presented by their claims. The only real question, therefore, is whether suit by these children through a representative is procedurally proper. Federal Rule of Civil Procedure 17(c), which specifically contemplates such a procedure,[5] answers that question affirmatively.

### B. *Joinder*

■ Defendants contend that there has been an improper joinder of parties under Federal Rule of Civil Procedure 20(a), which provides:

"All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action. All persons . . . may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action. A plaintiff or defendant need not be interested in obtaining or defending against all the relief demand-

ants do not contend that Michael, Robert, and James are not minors.

5. The rule provides:
"Whenever an infant or incompetent person has a representative, such as a general guardian, committee, conservator, or other like fiduciary, the representative may sue or defend on behalf of the infant or incompetent person. If an infant or incompetent person does not have a duly appointed representative he may sue by his next friend or by a guardian ad litem. The court shall appoint a guardian ad litem for an infant or incompetent person not otherwise represented in an action or shall make such other order as it deems proper for the protection of the infant or incompetent person."

ed. Judgment may be given for one or more of the plaintiffs according to their respective rights to relief, and against one or more defendants according to their respective liabilities."

Defendants argue that plaintiffs' claims against them do not "aris[e] out of the same transaction, occurrence, or series of transactions or occurrences" because they stem from events spanning a fourteen or fifteen month period.[6]

The joinder provisions of the Federal Rules are very liberal. As the Supreme Court noted in *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966),

"Under the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged."

383 U.S. at 724, 86 S.Ct. at 1138 (footnote omitted).

The reason for the liberality is that unification of claims in a single action is more convenient and less expensive and time-consuming for the parties and the court. *Mosley v. General Motors Corp.*, 497 F.2d 1330, 1332 (8th Cir. 1974). In recognition of this attitude, the "transaction or occurrence" language of Rule 20 has been interpreted to "permit all reasonably related claims for relief by or against different parties to be tried in a single proceeding. Absolute identity of all events is unnecessary." *Id.* at 1333.

6. The Federal Rules permit unlimited joinder of claims against an opposing party (Fed.R.Civ.P. 18(a)), but in multiparty cases joinder is limited by the requirement of Rule 20(a) that plaintiffs or defendants may not be joined in the same case unless some of the claims by or against each party arise out of common events and contain common factual or legal questions. Defendants have not argued that common factual and legal questions are not present in this case; the similarity of the claims against each defendant makes it abundantly clear that there are common issues. Once parties are joined under Rule 20(a), Rule 18(a)'s allowance of unlimited joinder of claims against those parties is fully applicable. *See* Advisory Committee on Rules, Note to 1966 Amendment to Rule 18.

■ Although the events giving rise to plaintiffs' claims in this case occurred over a lengthy time period, they all are "reasonably related." The complaint sets forth a series of alleged unlawful detentions, searches, beatings and similar occurrences and charges defendants with "engag[ing] in a systematic pattern of harassment, threats and coercion with the intention of . . . depriving plaintiffs of [their] rights"; each of the incidents set forth is encompassed within the "systematic pattern." There is no logical reason why the systematic conduct alleged could not extend over a lengthy time period and, on the face of these allegations, there is nothing about the extended time span that attenuates the factual relationship among all of these events. The claims against the defendants "aris[e] out of the same transaction, occurrence, or series of transactions or occurrences" for purposes of Rule 20(a), and therefore joinder of defendants in this case is proper.

Apart from the procedural propriety of the joinder under Rule 20(a), however, there is a question whether a single trial of all claims against all defendants will prejudice some of the defendants. Some of the defendants were involved in only one of the several incidents alleged, and lumping them together with other defendants who were involved in more than one incident may be unfair. This problem is of particular concern with respect to the December 29, 1975 incident, which, apart from the allegations of direction, supervision, and control, appears to involve different actors than the other incidents alleged. Federal Rule 20(b) provides the court with power to remedy this situation:

"The court may make such orders as will prevent a party from being embarrassed, delayed, or put to expense by the inclusion of a party against whom he asserts no claim and who asserts no claim against him, and may order separate trials or make other orders to prevent delay or prejudice."

At oral argument, counsel for both sides recognized the potential prejudicial effect of the joinder in this case and suggested formulation of a stipulation which would attempt to remedy the problem. It appears, however, that it will be better to deal with the problem after discovery has been completed and the case is ready for trial. At that time, the degree of involvement of each of the defendants will be more clear and potential prejudice will be easier to assess. I therefore shall defer decision of this aspect of the case. I shall retain flexibility to sever portions of it or to take other remedial actions, if necessary, once the prejudice issue is more clearly focused.

## IV. The Civil Rights Claims—Sections 1985, 1986

Plaintiffs' civil rights claims include claims under 42 U.S.C. §§ 1985 and 1986, the sections of the 1871 Civil Rights Act dealing with conspiracies to deny certain rights. The parties have not addressed their arguments to these claims, but since defendants' motion seeks dismissal of the complaint as to each of the moving defendants, consideration of these claims is necessary.[7]

■ Section 1985 is a lengthy statute which authorizes an action for damages by any person injured as a result of certain conspiratorial activities. As I recently noted,

"[t]he actionable conspiracies cover a wide range of activities, including interference with the duties of federal officials (§ 1985(1)), interference with federal court proceedings (§ 1985(2)), obstruction of the 'due course of justice in any State or Territory' with the intent to deny equal protection of the laws (§ 1985(2)), direct or indirect infringement of equal protection rights (§ 1985(3)), and interference with federal voting rights (§ 1985(3))."

*United States ex rel. Hoss v. Cuyler*, 452 F.Supp. 256, 279 (E.D.Pa.1978).

---

**7.** The City of Philadelphia has argued that it cannot be held liable under any section of the 1871 Civil Rights Act. This argument is discussed in Part V.D. of this opinion with respect to claims under 42 U.S.C. § 1983. As to the claims under § 1985 and 1986, the reasoning of this segment of the opinion applies equally to the City and the other defendants.

Here, as in that case, the allegations do not fit within any of those categories. Although the complaint cites the Equal Protection Clause of the Fourteenth Amendment, there is nothing in the complaint demonstrating that any of the defendants' acts were committed with a class-based discriminatory intent, and the allegations therefore do not state a claim within the equal protection provision of § 1985(3). Since the allegations do not fall within any of the actionable conspiracies of § 1985, the claims under that section against all defendants will be dismissed for failure to state a claim upon which relief can be granted.

■ Section 1986 authorizes an action for damages against any person who knows of and can prevent conduct made unlawful in § 1985 and who "neglects or refuses to do so." The section states that the § 1986 defendant is liable "for all damages caused by [the] wrongful act" under § 1985 "if such wrongful act be committed." A person therefore cannot be liable under § 1986 unless a violation of § 1985 (the "wrongful act") has occurred. Since in this case plaintiffs have not alleged a viable claim under § 1985, the § 1986 claim must be dismissed for failure to state a claim upon which relief can be granted.

### V. The Civil Rights Claims—Section 1983 and the Fourteenth Amendment

Plaintiffs' major claim under the 1871 Civil Rights Act is under 42 U.S.C. § 1983, which provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

In addition, as to defendant City of Philadelphia, plaintiffs assert a parallel claim directly under the Fourteenth Amendment to the Constitution.

The individual defendants argue that the § 1983 claim against them must be dismissed insofar as they are sued in their individual (i. e., unofficial) capacities because the claim fails to meet the "under color of" state law requirement. They also contend that the claim is barred by the statute of limitations. In addition, defendants O'Neill, Golden, and Patterson argue that the claim must be dismissed as to them because the only allegations as to them are conclusory averments of supervision. The City of Philadelphia contests assertion of the claims against it under both § 1983 and the Fourteenth Amendment, contending that it cannot be held liable as a matter of law.

### A. Color of state law

Plaintiffs sue the defendants "individually and in their official capacity." Defendants contend that the court "lacks subject matter jurisdiction" over the civil rights claims against them insofar as they are sued as individuals because "in their individual capacity, as opposed to their official capacity, it is impossible for them to 'act under color of law.'" Memorandum in Support of Motion to Dismiss, at 15.

■ Defendants are incorrect in making this assertion as a jurisdictional argument. As the Supreme Court noted in *Hagans v. Lavine*, 415 U.S. 528, 538, 94 S.Ct. 1372, 1379, 39 L.Ed.2d 577 (1974), "[j]urisdiction is essentially the authority conferred by Congress to decide a given type of case one way or the other," and such authority exists unless the claim is patently frivolous or insubstantial. The allegations in this case certainly are not within the insubstantial category.

"A claim is insubstantial only if ' "its unsoundness so clearly results from the previous decisions of [the Supreme Court] as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy." ' "

*Goosby v. Osser*, 409 U.S. 512, 518, 93 S.Ct. 854, 859, 35 L.Ed.2d 36 (1973), quot-

ing *Ex parte Poresky*, 290 U.S. 30, 32, 54 S.Ct. 3, 78 L.Ed. 152 (1933), and *Hannis Distilling Co. v. Mayor of Baltimore*, 216 U.S. 285, 288, 30 S.Ct. 326, 54 L.Ed. 482 (1910). Defendants have cited no Supreme Court decision which forecloses the subject of their personal liability as a matter of law; indeed the authorities are directly contrary to the position defendants advocate. The Court therefore has jurisdiction under 28 U.S.C. § 1343, which grants jurisdiction to hear civil actions to redress deprivations of federal rights.[8]

Defendants' argument is more properly addressed as a motion to dismiss for failure to state a claim upon which relief can be granted, for such a motion raises the substantive question whether defendants, when not acting in an official capacity, can be said as a matter of law not to act "under color" of state law. So viewing the motion, however, defendants' argument must be rejected.

■ "Sued individually and in their official capacity" is one of those standard boilerplate clauses that frequently find their way into pleadings against public officials. The purpose of such an averment appears to be the reservation of alternate sources of recovery for the alleged misconduct—the individual's personal resources, and the treasury of the governmental body which he serves. In this context, then, official capacity suits have been said to be "only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Department of Social Services*, 436 U.S. ——, —— n. 55, 98 S.Ct. 2018, 2036 n. 55, 56 L.Ed.2d 611 (1978). The distinction between the alternate categories of liability has not been explored at great length in the cases, but it appears to be that if the official is found liable for acts done within the scope of authority vested in him by his employer, he is liable in his "official capacity" and the employing entity may have to pay, whereas, if the official has acted outside of his authority, he was not acting "officially" and therefore only can be held personally liable for his conduct. *See, e. g., Driver v. Helms*, 577 F.2d 147, 151–154 (1st Cir. 1978); *Briggs v. Goodwin*, 186 U.S. App.D.C. 170, 569 F.2d 1, 4 (1977); *Walker v. Hughes*, 558 F.2d 1247, 1249 n. 1 (6th Cir. 1977); *Gurzo v. Gregory Park, Inc.*, 99 N.J. Super. 355, 240 A.2d 25 (Law Div. 1968); *Jones v. Van Bever*, 164 Ky. 80, 174 S.W. 795 (1915), *overruled on other grounds*, *Maryland Casualty Co. v. McCormack*, 488 S.W.2d 347, 352 (Ky.1972).[9]

■ Whatever the ramifications of the official/unofficial capacity distinction, it is not controlling for purposes of the statutory requirement that a § 1983 defendant act "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." That requirement is addressed to the source of authority for the defendant's conduct, and, so long as the state has clothed the defendant with apparent authority to act, the requirement has been met.[10] This source of authority ques-

---

**8.** Section 1343 provides:

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

. . . . .

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States . . . ."

**9.** The distinction appears to have had its greatest significance in cases in which the employer had sovereign immunity or some other absolute protection from liability which precluded its payment of judgments in official capacity suits. *See, e. g., Walker, supra; Monell v. Department of Social Serv.*, 532 F.2d 259, 264–67 (2d Cir. 1976), *rev'd*, 436 U.S. ——, 98 S.Ct. 2018, 56 L.Ed. 611 (1978); *Gurzo, supra*; H.R.Rep. No. 536, 87th Cong., 1st Sess. 1 (1961), *quoted in Driver, supra*, at 154. It may be that in other situations the importance of the distinction was undercut by the tendency of governmental employers to indemnify their employees for their torts. *See generally* Jaffe, *Suits Against Governments and Officers: Damage Actions*, 77 Harv.L.Rev. 209 (1963).

**10.** As the Supreme Court often has observed, § 1983 sets up two separate requirements for recovery. One is that the defendant have acted under color of state law; the other is that he

tion is much broader than whether a state employee has acted within the scope of his official authority. For example, a state employee may misuse power granted by the state, but in doing so he nevertheless acts under color of state law for civil rights liability purposes. *Monroe v. Pape*, 365 U.S. 167, 171–87, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *United States v. Classic*, 313 U.S. 299, 325–26, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941); *Jennings v. Shuman*, 567 F.2d 1213, 1219–20 (3d Cir. 1977); *Roberts v. Acres*, 495 F.2d 57, 59 (7th Cir. 1974). Whether he is acting within the lawful scope of his authority is of little legal significance so long as his apparent authority flows from the state or his conduct is in some way related to the state. *See, e. g., Scheuer v. Rhodes*, 416 U.S. 232, 235–38, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (by implication); *Basista v. Weir*, 340 F.2d 74, 80–81 (3d Cir. 1965). To be sure, "[a]n official's actions are not 'under color of' law merely because he is an official; an off-duty policeman's discipline of his own children, for example, would not constitute conduct 'under color of' law." *Paul v. Davis*, 424 U.S. 693, 717, 96 S.Ct. 1155, 1168, 47 L.Ed.2d 405 (1976) (Brennan, J., dissenting). The distinction in that hypothetical, however, is not that the policeman's conduct was beyond the scope of his authority, but that the conduct had absolutely no connection with his police officer authority in the first place. Where the initial power flows from the state, however, color of state law is present. Indeed, this is so even where the § 1983 defendant is not a state employee at all. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Price*, 383 U.S. 787, 794 & n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966); *see Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 155, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1978).

The complaint alleges that "the defendants and each of them, spearately [*sic*] and in concert, acted under color of the statutes, ordinances, regulations, customs, and usages of the Commonwealth of Pennsylvania and the City and County of Philadelphia." The defendants' allegedly unlawful activities occurred in connection with law enforcement functions of the government. Their power, though allegedly misused, derived from the state. According to the allegations, those defendants who acted in their unofficial capacity did so "in concert" with others acting in an official capacity. Given these allegations, defendants can be held liable insofar as they did not act

have deprived the plaintiff of a federally secured right. *See, e. g., Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In some respects, these two requirements may be confused, since most (but not all) federally secured rights actionable under § 1983 contain a "state action" element which, like the "under color of" law requirement, mandates assessment of the state's relationship to the conduct of which the plaintiff complains. *See generally Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155, 98 S.Ct. 1729, 1733–34, 56 L.Ed.2d 185 (1978). The requirements are analytically distinct, however. "State action" focuses on whether the conduct is such that it "may fairly be attributed to" the state in a case where the right deprived is, for example, the Fourteenth Amendment's guarantee that "[n]o state . . . shall . . . deprive any person of . . . property, without due process of law." *Id.* at 156, 98 S.Ct. at 1733–34. "Under color of" law focuses on whether the person who committed the deprivation acted or purported to act by authority conferred by the state, regardless of whether the right deprived involved "state action." If the § 1983 defendant is a private individual, color of state law means, at least, that he must have acted "with the knowledge of and pursuant to" a state statute, ordinance, regulation, custom, or usage. *Id.* at 156, 98 S.Ct. at 1733, quoting *Adickes, supra*, 398 U.S. at 161–62 n. 23, 90 S.Ct. 1598. If the defendant is a public official, however, it is enough that he acts by virtue of his official position, since he is clothed with power that flows from the state. *See Adickes*, 398 U.S. at 211–212, 90 S.Ct. 1598. (Brennan, J., concurring in part and dissenting in part). It should be noted that in the public official situation, the "color of" state law and "state action" concepts "merge", since the involvement of the state official automatically is sufficient to satisfy both requirements. *Flagg Bros.*, 436 U.S. at 157 n. 5, 98 S.Ct. at 1734 n. 5; *see id.* at 163 n. 14, 98 S.Ct. at 1744 n. 14 (Stevens, J., dissenting); *Adickes*, 398 U.S. at 152, 90 S.Ct. 1598; *United States v. Price*, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). Thus, while no question has been raised as to the presence of "state action" in this case, that element clearly has been satisfied.

in an official capacity, and therefore their contention on this issue will be rejected. *Accord, Norton v. McKeon,* 444 F.Supp. 384, 386 (E.D.Pa.1977).

### B. *Statute of limitations*

■ Defendants contend that plaintiffs' claims are barred by the statute of limitations. Since no federal limitations period is written into the 1871 Civil Rights Act, actions under that statute are governed by the period applicable to the most analogous cause of action under the law of the forum state.[11] *O'Sullivan v. Felix,* 233 U.S. 318, 34 S.Ct. 596, 58 L.Ed. 980 (1914); *Polite v. Diehl,* 507 F.2d 119, 122 (3d Cir. 1974) (en banc); *Henig v. Odorioso,* 385 F.2d 491, 493 (3d Cir. 1967), *cert. denied,* 390 U.S. 1016, 88 S.Ct. 1269, 20 L.Ed.2d 166 (1968). Resolution of this issue therefore requires analysis of plaintiffs' civil rights claims and of Pennsylvania law to determine the closest analogy and analysis of the Pennsylvania statutes of limitations to assess their application in light of the analogy.

In determining the appropriate analogy, I note at the outset that plaintiffs' claims sound in tort, since they assert wrongful conduct in breach of a legal duty and injurious to personal interests. *See Meyers v. Pennypack Woods Home Ownership Association,* 559 F.2d 894, 901 (3d Cir. 1977); W. Prosser, *Handbook of the Law of Torts* § 1 (4th ed. 1971). The analogy therefore must be found in Pennsylvania tort law. In addition, "each aspect of [the] complaint" must "be given separate statute of limitations treatment depending on the nature of the specific act or acts complained of." *Meyers,* at 901 (discussing claims under 1866 Civil Rights Act); *accord, Polite v. Diehl, supra,* 507 F.2d at 122–23 (claims under 1871 Act). *But see Regan v. Sullivan,* 557 F.2d 300 (2d Cir. 1977) (suggesting need for single limitations period for all § 1983 claims); *Smith v. Cremens,* 308 F.2d 187 (9th Cir. 1962) (same). The tort law analysis is to be made from three perspectives: the defendants'

conduct, the plaintiffs' injury, and the relief requested. *Meyers,* at 901.

Looking to the various aspects of plaintiffs' civil rights claims, one of the most recurring allegations is that defendants arrested and detained plaintiffs illegally. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." This prohibition is applicable to the states by virtue of the Due Process Clause of the Fourteenth Amendment (*see, e. g., Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949)), and since the arrests and detentions complained of were "seizures" of persons within the meaning of the Fourth Amendment (*see Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)), that prohibition is applicable here. A survey of Pennsylvania law discloses that the tort most analogous to this type of civil rights claim is false imprisonment. At common law, as applied in Pennsylvania, "[t]he gist of false imprisonment is unlawful detention", and the Pennsylvania Supreme Court has held that the tort is applicable to unlawful arrests by police officers. *See McCarthy v. DeArmit,* 99 Pa. 63, 71 (1881). *See generally* Restatement (Second) of Torts §§ 35–45A (1965). Both the conduct and the injury in this case match that in a false imprisonment case and the relief requested—damages—is fully consistent with such a tort action (*see, e. g., Duggan v. Baltimore & O. R.R.,* 159 Pa. 248, 253, 28 A. 182, 184 (1893)).

Another recurring aspect of the complaint is the repeated allegation of physical beatings. Such conduct is actionable as a civil rights violation since it deprives a person of his liberty interest in personal security without due process of law. *Johnson v. Glick,* 481 F.2d 1028, 1032–33 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32 (1973); *Schweiker v. Gordon,*

---

11. The one exception is 42 U.S.C. § 1986, which requires that the action be "commenced within one year after the cause of action has accrued."

Since I have held that plaintiffs have failed to state a claim under § 1986, I need not discuss application of that one year time period.

442 F.Supp. 1134, 1138 & n. 2 (E.D.Pa.1977). The tort analogue to such a civil rights claim is readily apparent. At common law, as applied in Pennsylvania, an intentional attempt to inflict physical injury on another constitutes assault and the actual infliction of such injury, however minor, constitutes battery. *See, e. g., Cucinotti v. Ortmann*, 399 Pa. 26, 27–28, 159 A.2d 216, 217–18 (1960); *Butler v. Stockdale*, 19 Pa.Super. 98, 107 (1902). *See generally* Restatement 2d, *supra*, §§ 13–34. The allegations in the complaint are typical of a traditional assault and battery action.

A third type of claim presented in the complaint deals with the allegedly unlawful searches of the Rozanski bedroom and the Kedra home. Again, the basis for this type of civil rights claim is the prohibition against unreasonable searches and seizures, but, unlike the arrest and detention situation already discussed, the conduct here is directed to the plaintiffs' property rather than their person. It therefore is more closely analogous to such torts as trespass to land or to chattels. *See generally* Restatement 2d, *supra* §§ 157–164 (trespass to land), 216–222 (trespass to chattels), 222A–242 (conversion). The injury suffered by plaintiffs as a result of the searches, however, distinguishes this type of claim from that for mere invasion of property rights. It now is firmly established that the search and seizure provisions of the Constitution are directed primarily toward protection of a person's privacy (*see, e. g., United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)), and the analogous tort therefore should be one that protects privacy interests.

Modern tort law, as developed in Pennsylvania, recognizes a cause of action for invasion of privacy in four separate, but interrelated, areas. *See Vogel v. W. T. Grant Co.*, 458 Pa. 124, 327 A.2d 133 (1974); Restatement (Second) of Torts §§ 652A–652E (1977). One of these areas concerns unreasonable intrusion upon a person's seclusion, and § 652B of the Second Restatement summarizes that aspect of the tort as follows:

"One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person."

The rule applies to intrusions into any place where the person has a reasonable expectation of privacy, including inspections of the person's property. Restatement 2d, § 652B, Comment *b*. In Pennsylvania, the tort has been limited by the requirement that the intrusion result in disclosure of information to some person, rather than merely to an unused mechanical device such as a wire tap (*Marks v. Bell Telephone Co.*, 460 Pa. 73, 85–88, 331 A.2d 424, 430–31 (1975)), but, apart from this restriction, the tort is fully recognized. *See Marks, supra*; *Vernars v. Young*, 539 F.2d 966, 968–69 (3d Cir. 1976) (applying Pennsylvania law). It also is recognized that commission of the tort imposes liability for damages. *See Marks, supra*; Restatement 2d, *supra*, § 652H. I conclude that the tort of intrusion is the appropriate analogue to the civil rights claims based on unlawful searches of property.[12]

12. Although those aspects of plaintiffs' case based on arrest and detention and on property searches both derive from the same constitutional source—the prohibition against unreasonable searches and seizures—it is not inconsistent to treat them differently in ascertaining the appropriate state law analogy. The fact that the constitutional provision is concerned mainly with privacy protection does not mean that invasion of privacy is the only appropriate analogue. Privacy, in the sense of the "right to be left alone" (*Katz, supra*, 389 U.S. at 350, 88

S.Ct. 507), is a very broad concept which in some of its aspects permeates many torts. False imprisonment, the essence of which is the right to be free from restraint by other persons, is an obvious example. In determining the state law analogy, then, the task is to determine which tort comes closest to protecting that type of privacy interest which is most implicated by the particular search and seizure violation in question. False imprisonment comes closest with respect to seizures of persons; intrusion (invasion of privacy) is closest

■ The final [13] aspect of plaintiffs' civil rights claims consists of the allegations that Rozanski and Kenneth and Joseph Kedra were charged with crimes "without just or probable cause." The civil rights violation lies in deprivation of the charged parties' liberty without due process of law. *See Jennings v. Shuman,* 567 F.2d 1213, 1220 (3d Cir. 1977). The type of injury suffered—wrongful subjection to litigation—is analogous to that suffered as a result of two common law torts, abuse of process and malicious use of process (known as malicious prosecution in cases where, as here, the process used was criminal). *See generally* Restatement 2d, *supra,* §§ 653–682. Recently, in *Jennings, supra,* at 1216–19, the Court of Appeals surveyed Pennsylvania law with respect to these torts and explained the distinction to be relied upon in determining state law analogies to civil rights actions. As the Court stated, the key factor in an abuse of process action is the *use* to which the process is put. If process is used to accomplish a purpose for which it is not intended, *e. g.,* to accomplish extortion, abuse of process applies. On the other hand, the focus in a malicious prosecution action is the *justification* proffered as a basis for issuance of the process. If prosecution is instituted without probable cause and merely on the basis of untrue statements, the accused may assert an action for malicious prosecution if the proceedings terminate in his favor. The allegations in this case are that the defendants filed criminal charges against Rozanski and Joseph and Kenneth Kedra "without just or probable cause" and that these plaintiffs were acquitted of the charges. The focus of the averments thus is on the lack of proper justification for filing of the charges, and this aspect of the case therefore is most closely analogous to malicious prosecution. The relief requested, damages, is consistent with selection of this tort. *See* Restatement 2d, *supra,* §§ 670–671.

■ The basic Pennsylvania statute of limitations applicable to this case was enacted during the colonial era, in 1713. Nevertheless, it still has the force of law. *See* Statutory Construction Act of 1972, 1 Pa. C.S.A. § 1503(b).[14] In its early eigh-

---

with respect to the searches involved in this case. If property were seized, it would seem that a third tort, conversion, might come into play. *See Polite v. Diehl,* 507 F.2d 119, 123 (3d Cir. 1974) (en banc) (referring to "actions for the recovery of goods").

**13.** In parsing the complaint to determine those aspects of plaintiffs' claims that should be given separate treatment, I have selected only those which appear from the wording of the complaint to be advanced by plaintiffs as distinct civil rights violations. There are two other types of allegations in the complaint that arguably could be given separate treatment, but, as I interpret the complaint, they were not intended to be advanced as separate grounds for recovery. The first of these is the allegation that defendants denied certain plaintiffs' requests to consult with counsel during detention at the Roundhouse. While deprivation of counsel during a critical stage of a criminal proceeding violates the Constitution, it is not clear that such a stage was involved here or that the right attached as a result. In any event, although the civil rights claims are listed in great detail in the complaint, there is no mention of a claim based on denial of counsel, and I therefore conclude that, while the deprivation of counsel allegations are germane to description of the general atmosphere of the alleged unlawful detention, they do not constitute separate claims in themselves.

The second set of allegations is that charging defendants Brady and Pitney with attempted confiscation of Joseph Kedra's camera and note pad. Although under the Taking Clause confiscation is a matter of constitutional significance, I am aware of no case imposing civil rights liability for attempted confiscation. The complaint asserts a state law claim for trespass to personal property, and these allegations are relevant to that claim; but I do not believe they are intended to assert a separate right of action under § 1983.

Finally, I note that the complaint asserts violations of the rights of free speech, assembly, freedom from compulsory self-incrimination, and freedom from cruel and unusual punishment. Insofar as these asserted civil rights violations are based on factual allegations not already discussed, I find no basis for them in the complaint. Of course, at this stage of the proceedings the complaint must be construed liberally in plaintiffs' favor. If I have misinterpreted the complaint, plaintiffs will have ample opportunity to correct the error through procedures afforded by the Federal Rules.

**14.** Pennsylvania recently revised its limitations statutes as part of the codification of its Judicial Code. *See* 42 Pa. C.S.A. §§ 5501 *et seq.*

teenth century syntax, § 1 of the statute, 12 Pa.Stat.Ann. § 31 (Purdon), provides:

"All actions of trespass quare clausum fregit, all actions of detinue, trover and replevin, for taking away goods and cattle, all actions upon account and upon the case (other than such accounts as concern the trade of merchandise between merchant and merchant, their factors or servants), all actions of debt grounded upon any lending, or contract without specialty, all actions of debt, for arrearages of rent, except the proprietaries' quit-rents, and all actions of trespass, of assault, menace, battery, wounding and imprisonment, or any of them, . . . shall be commenced and sued within the time and limitation hereafter expressed, and not after; that is to say, the said actions upon the case, other than for slander, and the said actions for account, and the said actions for trespass, debt, detinue and

replevin, for goods or cattle, and the said actions of trespass quare clausum fregit . . . within six years next after the cause of such actions or suit, and not after. And the said actions of trespass, of assault, menace, battery, wounding, imprisonment, or any of them, . . . within two years next after the cause of such actions or suit, and not after; and the said actions upon the case for words, within one year next after the words spoken, and not after."

For purposes of this case, the section's relevant provisions are that actions for assault, battery, and false imprisonment must be commenced within two years and that actions for "trespass," a generic term applied to torts involving direct application of force, and actions "upon the case," i. e., for torts not involving direct application of force,[15] must be commenced within six years.

The new statutes eliminate many of the limitations issues encountered in this case by, for example, making actions for assault, battery, false imprisonment, and false arrest subject to the same two-year limitations period. See 42 Pa. C.S.A. § 5524(1). The Judicial Code was enacted by the Judiciary Act of 1976, Act No. 142, § 2, 1976 Pa. Laws 586, and its "supplement", the Judiciary Act Repealer Act (JARA), Act No. 1978–53, 1978 Pa. Laws ——, and it went into effect on June 27, 1978 (sixty days after the April 28, 1978 enactment of the JARA). See Judiciary Act of 1976, § 29(4); JARA §§ 2(a) (repealing § 29(4) of 1976 Act), 43. On that date, the limitations statutes discussed in the text, as well as other statutes pertaining to the judiciary, were repealed. See JARA, § 2(a). See also id. § 4 (delayed repeals). The statutory transition has no bearing on this case; this action is not governed by the new Judicial Code. See Statutory Construction Act of 1972, 1 Pa. C.S.A. § 1976(a). See also Judiciary Act of 1976, § 25 (effect of new Code on periods of limitation).

15. Anglo-American tort law originated at a time when legal recovery required issuance of special writs by the King. The writs available for tort actions were for "trespass" and "trespass on the case," and tort law became tied to the technical requirements of these writs. Prosser, supra, § 7. As it developed historically, trespass applied to actions involving immediate application of force to the plaintiff's person or property. See, e. g., LeGaux v. Feasor, 1 Yeates 586 (Pa.1795). It was of three types: trespass vi et armis, which involved physical force against the person; quare clausum fregit,

involving injury to realty; and de bonis asportatis, involving injury to personalty. See, e. g., Battles v. Nesbit, 149 Pa.Super. 113, 119, 27 A.2d 694, 697 (1942). After further historical development, the writ came to be associated only with intentional torts, particularly assault, battery, false imprisonment, trespass to land, and trespass to chattels. See Prosser, supra, § 7, at 29–30; § 8, at 33–34. Trespass on the case (or, simply, "case") applied to those torts not within the trespass writ. See Battles, supra. The distinction between trespass and case has little modern significance in Pennsylvania in light of the Practice Act of 1887, 12 Pa.Stat. Ann. § 2 (Purdon) (abolishing procedural distinction between trespass and case and making all torts actionable in "trespass"), but since the colonial statute of limitations uses that terminology, and since "[s]tatutes are 'to be construed in connection and in harmony with the existing law, and as a part of a general and uniform system of jurisprudence' " (Seltzer v. Reading, 151 Pa.Super. 226, 230, 30 A.2d 177, 179 (1943), allocatur refused, 160 Pa.Super. xxxi (Pa.), quoting 59 C.J., Statutes § 616, at 1038 (1932)), the meaning of those terms during the colonial period is relevant in interpreting the statute. Since the statute applies the same limitations period (six years) to actions in trespass and on the case, however, I need not determine whether the analogous torts I have selected sound in trespass or case as those terms were used in the early eighteenth century. With the exception of certain property actions such as trover and replevin, together the two terms denote all tort actions know to

Insofar as is pertinent to this case, the limitations periods of the colonial statute have been changed by two enactments of the General Assembly. The first was the Act of June 24, 1895, Act No. 135, 1895 Pa. Laws 236,[16] § 2 of which, 12 Pa.Stat.Ann. § 34 (Purdon), provides:

> "Every suit hereafter brought to recover damages for injury wrongfully done to the person, in case where the injury does not result in death, must be brought within two years from the time when the injury was done and not afterwards . . . ."

The controlling question under this statute is whether the claim involves "injury wrongfully done to the person." Recently, the Court of Appeals suggested that this phrase applies only to "actions for bodily injury." *Meyers v. Pennypack Woods Home Ownership Association*, 559 F.2d 894, 902 (3d Cir. 1977) (footnote omitted). Typical application of the statute is to negligence actions involving physical injury, which formerly were governed by the six year period for actions "upon the case." *See, e. g., Walker v. Mummert*, 394 Pa. 146, 146 A.2d 289 (1958). In addition, the statute extends to claims such as assault and battery, which also involve "bodily injury." *See, e. g., Polite v. Diehl*, 507 F.2d 119 (3d Cir. 1974) (en banc). Beyond this, however, a survey of the cases indicates that the statute has not been tied strictly to cases involving infliction of physical harm, but has been applied to cases involving more general types of personal injury, as distinguished from harm to property. In that context, the statute has been applied to claims for false imprisonment (*Jones-Burget v. Borough of Dormont*, 14 F.2d 954 (3d Cir. 1926), *error dismissed*, 275 U.S. 577, 48 S.Ct. 140, 72 L.Ed. 435 (1927))[17] and invasion of privacy (*Hull v. Curtis Publishing Co.*, 182 Pa.Super. 86, 125 A.2d 644 (1956)), neither of which involve "bodily injury" in the sense of physical harm. It is not necessary to precisely define the scope of the statute for purposes of this case.

The second modification of the limitations periods was made by the Act of July 1, 1935, Act No. 196, 1935 Pa. Laws 503.[18] Section 1 of that statute, 12 Pa.Stat.Ann. § 51 (Purdon), provides:

> "Every suit to recover damages for malicious prosecution or for false arrest, because of a right of action hereafter accruing, must be brought within one year from the date of the accruing of such right of action, and not thereafter . . . ."

Application of this section to malicious prosecution, a tort well recognized at common law, is fairly straightforward, but its application to "false arrest" has caused difficulty.

 At common law, there was no separate tort of false arrest; instead, such conduct was included within the more general tort of false imprisonment. Through the 1935 Act, the legislature, in effect, bifurcated false imprisonment for statute of limitations purposes, providing a one year time limit for conduct constituting false arrest and leaving the two year limit in force for all other false imprisonments. It was left to the courts to determine what conduct was within the false arrest category. The distinction adopted by the Pennsylvania Supreme Court is that false arrest

---

common law, and their use in the statute therefore compels application of a six year period to tort actions except where the statute explicitly states otherwise.

16. Although it did not expressly repeal inconsistent provisions of the colonial statute, the 1895 Act has been held to have done so by implication. *Walker v. Mummert*, 394 Pa. 146, 148, 146 A.2d 289, 290 (1958), citing *Peterson v. Delaware River Ferry Co.*, 190 Pa. 364, 42 A. 955 (1899); *see Rodebaugh v. Philadelphia Traction Co.*, 190 Pa. 358, 42 A. 953 (1899).

17. As the Pennsylvania Supreme Court has noted, whether the 1895 Act or the colonial statute is applied to false imprisonment makes little difference, since in either case the limitations period is two years. *Gagliardi v. Lynn*, 446 Pa. 144, 148 n. 1, 285 A.2d 109, 111 n. 1 (1971). The same observation can be made with respect to assault, which, when not accompanied by a battery, does not result in "bodily injury."

18. Section 2 of the Act expressly repealed "[a]ll acts or parts of acts inconsistent herewith."

consists of arrests in which the defendant "purports to act for the purpose of securing the administration of the law without actual legal justification." *Gagliardi v. Lynn*, 446 Pa. 144, 149, 285 A.2d 109, 111 (1971), quoting *Rhodes v. Reading Co.*, 83 Pa. D. & C. 168, 170 (C.P.Phila.1952). "Arrest" has been defined as "'the taking of another into the custody of the actor for the actual or purported purpose of bringing the other before a court, or of otherwise securing the administration of the law.'" Restatement (Second) of Torts, § 112 (1965), *quoted in Gagliardi*, at 148 n.3, 285 A.2d at 111 n.3. There are no cases discussing the full scope of the "arrest" concept as it applies to the statute, but, given the statute's apparent purpose of protecting persons purportedly acting for law enforcement purposes, it is possible that the scope will be broadened to include arrest-like situations involving personal confrontations with law enforcement officers necessarily resulting in detention—e. g., "stop and frisk" situations involving temporary detentions for weapons searches. On the other hand, it is apparent that there will be confinements that, although based on law enforcement justifications, will be so far divorced from the arrest concept that they cannot be included within the statute's ambit without stretching its wording too far beyond normal understanding—e. g., cases of jailers refusing to release prisoners from custody. Commentators have suggested that conduct not amounting to arrest is not covered by the statute (*see* Robert Levin, Russell Levin, & Leonard Levin, *Summary of Pennsylvania Jurisprudence: Torts* § 306, at 319 (1958); 16 P.L.E., False Imprisonment § 5, at 298 (1959)[19], and the Court of Appeals has noted this viewpoint (*Henig v. Odorioso*, 385 F.2d 491, 493 n.5 (3d Cir. 1967), *cert. denied*, 390 U.S. 1016, 88 S.Ct. 1269, 20 L.Ed.2d 166 (1968) (dictum)). It has been held that the statute applies to any confinement that is "inextricably intertwined with an unlawful arrest," so that any incarceration arising out of the arrest is governed by the Act. *Gagliardi*, at 150, 285 A.2d at 112; *Hileman v. Knable*, 391 F.2d

596 (3d Cir. 1968) (per curiam); *Henig, supra*, at 493 n.5; *Getz v. Bruch*, 400 F.Supp. 1033, 1035 & n.3, 1037 (E.D.Pa.1975).

Applying this limitations scheme to the various aspects of the claims before me, the first to be considered is the charge of unlawful arrest and detention, which I have held analogous to false imprisonment. The averments on this matter fall into two relevant categories. First, it is alleged, particularly with respect to the events of December 22, 1975, that some of the plaintiffs were taken into custody forcibly by some of the defendants who purportedly were acting for law enforcement purposes. These averments amount to claims of false arrest as that term is used in the 1935 Act and therefore are governed by the statute's one year time period. Since the complaint was filed on November 23, 1977, plaintiffs may not recover for those incidents of false arrest (or detentions resulting from those arrests) accruing prior to November 23, 1976.

The second category of averments on this matter concerns detentions not following arrests. The main averment of this type is that stating that on December 29, 1975, all of the plaintiffs except Dolores Kedra were confined to the Kedra residence by defendant policemen, who blocked the exits and threatened the plaintiffs with their weapons. It is stated that the incident began when the policeman "demanded to see plaintiff Richard Rozanski, falsely stating that they had papers for his appearance in Court on the following day." They unsuccessfully "attempted to drag [Rozanski] out of the house" and then broke into the house by breaking down the door. Ultimately, Rozanski and Joseph, Michael, and Kenneth Kedra were arrested. These allegations disclose that the defendants purported to act for law enforcement purposes, but I do not believe that the facts alleged clearly constitute false arrest as used in the 1935 Act. According to the complaint, the policemen did not go to the Kedra home to arrest anyone, but merely to give some sort

---

**19.** The one case cited by the encyclopedia, *Goodman v. Frank and Seder of Philadelphia,* *Inc.*, 70 Pa. D. & C. 622 (C.P.Phila.1950), doesn't discuss the issue in any detail.

of legal documents to Rozanski. Although I have recognized that the Pennsylvania courts might decide to apply the 1935 Act to conduct closely analogous to arrest, the conveyance of legal documents is not such analogous conduct. On the facts alleged, therefore, the detention of plaintiffs in the Kedra home had no relation to an arrest objective. Of course, the December 29 incident eventually culminated in arrest of four of the plaintiffs, but the facts alleged do not clearly demonstrate that the detention of all plaintiffs in the house was done as a means of effectuating these arrests; the complaint can be fairly read to assert that the arrests occurred only after plaintiffs resisted defendants' unlawful conduct, including the detention. On a motion to dismiss, I must read the complaint in the plaintiffs' favor. Doing so, I conclude that plaintiffs have made a colorable claim of false imprisonment that was not closely intertwined with a false arrest and as to these allegations should have the benefit of the two year statute for purposes of this motion. Under the two year statute, this aspect of the claim is timely. Of course, discovery may throw additional light on this issue, making it appropriate for summary judgment, and, beyond that, if at trial the jury concludes that the December 29 detention was "inextricably intertwined with an unlawful arrest" (*Gagliardi*, at 150, 285 A.2d at 112) recovery for this aspect of the case will be barred by the 1935 Act.[20]

With respect to the physical beatings, which are analogous to assault and battery, the two year period of the 1895 Act (as well as of the colonial statute) applies. Since all of the alleged beatings occurred after November 23, 1975, these aspects of the claims are not time-barred. Defendants contend, however, that the claims of alleged beatings are so closely intertwined with those relating to arrest and detention that the one year false arrest statute should apply to all of them. The cases do not support defendants' contention, however.

At common law, any offensive contact, however minor, constitutes battery. *See generally* Restatement 2d, *supra*, §§ 13–20. Under this definition, the process of arrest will often include commission of a battery, as, for example, when the arresting officer places his hand on the arrestee's arm to guide him to a police van or affixes handcuffs to the arrestee's wrists. Recognizing that such technical batteries are "inextricably intertwined" with the arrest process itself, the Pennsylvania Supreme Court in *Gagliardi* stated that actions for such conduct would be governed by the limitations period applicable to false arrest.[21] If the battery is not so "inextricably intertwined", however, the two year statute applies. The test is whether the battery constitutes an integral part of the arrest process itself. Thus, if the battery did not occur until after completion of the arrest, it is not subsumed into the false

20. At that time it will be necessary to determine whether the bar applies only to the plaintiffs actually arrested or also to those detained plaintiffs who were not arrested.

21. As already discussed, *Gagliardi* was concerned with the relationship between false arrest and false imprisonment for statute of limitations purposes. The discussion of battery was in response to an argument of the plaintiff-appellant that false imprisonment should not be subject to the one year period applicable to false arrest because "every false arrest does not involve a false imprisonment." 446 Pa. at 150, 285 A.2d at 112. Explaining this contention, the Court observed:

 "Among other examples, appellant presents the situation where a police officer, by touching, arrests the driver of a vehicle who immediately speeds off. While it is true

that there is no confinement here, the proper remedy would seem to be an action of battery, assuming the arrest is unlawful. 'If an arrest is made by a mere touching without confinement, as in the execution of a valid warrant, the touching is offensive and, unless privileged, is a "battery" . . . .' *Restatement 2d, Torts*, § 118, comment *b* (1965)."

*Id.* at 150 n.5, 285 A.2d at 112 n.5.

The Court rejected the appellant's contention on the false imprisonment issue and then added the dictum that, "[b]y the same token, if the false arrest involved only a touching and no confinement, and we were forced to choose between limitation statutes relating to false arrest and battery, we would opt for the former." *Id.* at 150, 285 A.2d at 112.

arrest for statute of limitations purposes. *Polite v. Diehl*, 507 F.2d 119, 122–23 (3d Cir. 1974) (en banc). Beyond that temporal distinction, however, if the force used was beyond that necessary to accomplish the arrest, it would not be an integral part of the arrest process and thus would not be "inextricably intertwined" with it. As Judge Higginbotham stated in dealing with this problem in *Lopez v. White*, 443 F.Supp. 556, 559 (E.D.Pa.1977):

> "The alleged assaults in this case were prior to arrest, but I find that they were not 'inextricably intertwined' with the arrest. Although almost all false arrests involve at least a technical assault and battery, the alleged actions here constitute far more than a technical tort. The assaults, as alleged, were not commenced for the purpose of accomplishing an arrest. They were of a severity far exceeding that necessary to accomplish an arrest. In no sense were they 'inextricably intertwined' with the arrest. The false arrest limitation thus does not apply and

the claims based on assault and battery are not barred."

*See also Polite, supra*, at 123 (noting that the *Gagliardi* dictum "refers only to a 'touching' or battery committed in accomplishing an arrest").[22] The complaint, as detailed in Part I of this opinion, alleges that defendants used physical force far in excess of that necessary to accomplish the arrests or continue the detentions. The claims of physical beatings therefore are actionable apart from the arrests and are not time-barred.

■ I have held that the unlawful search allegations are analogous to the tort of intrusion. That tort was not recognized in Pennsylvania when the colonial statute was adopted, but it would fall within that statute's provisions for actions in trespass or on the case, to which a six year period applies. It appears, however, that intrusion also falls within the class of torts involving personal injury, to which the two year provision of the 1895 Act applies. *See Hull v. Curtis Publishing Co.*, 182 Pa. 86, 125 A.2d 644 (1956).[23] I need not resolve that ques-

22. In *Polite*, the Court dealt with alleged beatings which occurred after the arrest had been completed, and it therefore did not have to decide whether a beating resulting from the use of excessive force during an arrest would be subsumed into a false arrest for statute of limitations purposes. Its analysis was not hostile to the conclusion that the beating would not be subsumed, however. Moreover, such a conclusion is strongly suggested, if not compelled by *Gagliardi*, which, in stating when the Pennsylvania court would opt for application of the false arrest limitations period, spoke only in terms of technical touchings such as the execution of a warrant. It also is most logical when the limitations problem is viewed in relation to the substantive law. If the actionable conduct consists merely of force necessary to accomplish an arrest, the defendant may, in defense, assert that, since he was making a lawful arrest, his conduct was privileged. *See* Restatement 2d, *supra*, §§ 118–139. The privilege, however, does not extend to the use of excessive force, and the defendant remains liable for the excess. *Id.* §§ 132–133. By carrying the excessive force distinction over to the limitations area, the scope of the false arrest limitations statute is made coterminous with conduct subject to the arrest privilege. Since, by definition, an arrest is "false" only if the arrest privilege is inapplicable (*see Gagliardi*, 446 Pa. at 148 n. 3, 285 A.2d at 111 n. 3), these concepts are merely two heads of the same coin

and their scope should be determined according to a uniform rule.

23. *Hull* was an action for "invasion of privacy," and the case was decided before that tort was clearly recognized by the Pennsylvania courts; existence of the tort was assumed for purposes of the decision. *See* 182 Pa.Super. at 190–95, 125 A.2d at 645–48. Since that time, the Pennsylvania Supreme Court has held that "invasion of privacy" actually consists of four analytically distinct torts—intrusion, appropriation of name or likeness, publicity given to private life, and publicity placing a person in a false light. *Marks v. Bell Tel. Co.*, 460 Pa. 73, 85–86, 331 A.2d 424, 430 (1975); *Vogel v. W. T. Grant Co.*, 458 Pa. 124, 129–30 n. 9, 327 A.2d 133, 136 n. 9 (1974). *Hull* best fits within the tort of publicity given to private life. *See Vogel*, at 130, 327 A.2d at 136. Its application of the 1895 Act to "invasion of privacy" actions has been followed in cases dealing with appropriation of name or likeness (*Kennedy v. Bulletin Co.*, 237 Pa.Super. 66, 346 A.2d 343 (1975), *allocatur refused*, 237 Pa.Super. xxv (Pa.); *Hoffman v. Hibbs*, 235 Pa.Super. 470, 344 A.2d 546 (1975), *allocatur refused*, 237 Pa.Super. xxix (Pa.); *Jackson v. Ideal Publ. Corp.*, 274 F.Supp. 318 (E.D.Pa.1967)), even though that tort is more closely related to property rights than personal rights (*see* Restatement 2d, *supra*, § 652C, Comment *a*). This case deals

tion in this case since, even if the shorter period is applicable, the claim is timely. None of the events alleged occurred before November 23, 1975.

■■■ The final aspect of the case deals with allegations analogous to malicious prosecution. Under the 1935 Act, such claims are subject to a one year time period, and therefore claims accruing prior to November 23, 1976 are time barred. I cannot dismiss the malicious prosecution aspect of this case at this time, however. At common law, an action for malicious prosecution does not accrue until the criminal case terminates in acquittal. *Sicola v. First National Bank*, 404 Pa. 18, 170 A.2d 584 (1961). Although the complaint alleges acquittal, it does not state when acquittal occurred. Of course, the claims under consideration in this portion of the opinion are for civil rights violations, not for common law malicious prosecution, and it is not clear that acquittal is an essential element of the civil rights action. Even if this type of civil rights claim accrues when the false charges are filed, however, the claim cannot be dismissed at this time, since there is no allegation of when the charges were brought. Once a record on this issue has been made, defendants may, if the facts warrant, seek to have this aspect of the case resolved on a motion for summary judgment.

In summary, the only civil rights claims subject to dismissal on statute of limitations grounds at this time are those amounting to false arrest and occurring prior to November 23, 1976. Study of the complaint discloses that this result compels dismissal of the action against defendant Vassor, since the only allegation against him is that he wrongfully arrested Richard Rozanski and Joseph and Michael Kedra on December 22, 1975. Since all of the other defendants are implicated in other aspects of the case, the claims will not be dismissed as to them on this ground.

with intrusion, which, on the facts alleged, involved intermeddling with the plaintiffs' property and did not result in "bodily injury". It did result, however, in invasion of the plaintiffs' personal interest in maintaining seclusion,

## C. Involvement of supervisory personnel

Defendants O'Neill, Golden, and Patterson contend that the complaint against them should be dismissed because it merely sets forth conclusory allegations of supervisory authority on their part and therefore fails to state a cause of action. In light of the statute of limitations holding, this argument also applies to defendant Simmins, since the only other allegation against him is that he participated in the detention of Elizabeth Rozanski following her wrongful arrest on December 22, 1975 and since that conduct is included in the time-barred false arrest aspect of the case. Claims with respect to supervision also apply to defendants Miller and Tiers, although those defendants are subject to additional averments that would impose liability apart from their supervisory role.

■■■ The theory of liability advanced against the supervisory officials is that they directly supervised the conduct of their subordinates that deprived plaintiffs of their rights. There are no allegations of negligent training and supervision or of vicarious liability for the subordinates' acts. *Cf. Schweiker v. Gordon*, 442 F.Supp. 1134, 1136–39 (E.D.Pa.1977) (discussing application of these theories to claims against Commissioner O'Neill). In *Schweiker*, I recognized the possibility that

> "if O'Neill knew that these policemen were engaged in a continuous practice of unconstitutional conduct and nevertheless refused to take any action to rectify that situation, he could be held personally accountable for his intentional failure to prevent civil rights violations by these policemen."

442 F.Supp. at 1140 (citing cases).

Plaintiffs' theory in this case presents an even stronger case for imposing liability—actual control and supervision of the subordinate wrongdoers as they performed their

with disruption of the emotional satisfaction which that interest provides. As the text notes, I need not decide whether the 1895 Act applies to these facts.

wrongful acts. There can be no doubt that if a supervisor directs a subordinate to interfere with the rights of another, the supervisor should be held liable for his actions.

Since the theory advanced by plaintiffs is a valid one, the only question is whether they have sufficiently alleged facts in its support. Like all other civil actions, civil rights cases are governed by the requirement that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed.R.Civ.P. 8(a)(2)), but because of the "considerable expense, vexation, and perhaps unfounded notoriety" which these cases bring to defendants and because "[a] substantial number of these cases are frivolous or should be litigated in the State courts" (*Valley v. Maule,* 297 F.Supp. 958, 960–61 (D.Conn.1968), *quoted with approval in Kauffman v. Moss,* 420 F.2d 1270, 1276 n. 15 (3d Cir.), *cert. denied,* 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970)), the Rule 8(a)(2) requirement is applied somewhat more stringently to civil rights claims. *See Jones v. McElroy,* 429 F.Supp. 848, 863 (E.D.Pa.1977). The Third Circuit has endorsed this view in a long line of decisions,[24] applying it to "broad and conclusory" allegations (*Negrich v. Hohn,* 379 F.2d 213, 215 (3d Cir. 1967)) that are "without facts upon which to assess the substantiality of the claim." *Hall v. Pennsylvania State Police,* 570 F.2d 86, 89 (3d Cir. 1978). In light of the rule's rationale, I have stated that "it merely requires the pleading of allegations sufficient to assure the court that the claim has some basis in fact." *Flesch v. Eastern Pennsylvania Psychiatric Institute,* 434 F.Supp. 963, 973 (E.D.Pa.1977). The degree of specificity necessary to satisfy this standard will vary according to the legal theory asserted. *Compare Croswell v. O'Hara,* 443 F.Supp. 895, 897–98 (E.D.Pa.1978) (allega-

tion that white policeman abused black plaintiff was sufficient to allege discriminatory intent for purposes of 1866 Civil Rights Act), *with Schweiker, supra,* 442 F.Supp. at 1139–41 (unsubstantiated allegation that unidentified police officers had bad conduct records of which Commissioner O'Neill should have been aware was insufficient basis for holding O'Neill liable on theory of knowing acquiescence in unlawful police conduct). In applying the standard, the liberal notice pleading policy of the Federal Rules must be kept in mind, and so long as a claim has some semblance of factual support it should not be dismissed; deficiencies in the averments can be corrected by a motion for a more definite statement under Rule 12(e). *See Conley v. Gibson,* 355 U.S. 41, 47–48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Fed.R.Civ.P. 8(f).

The complaint alleges that, by virtue of their official positions, the supervisory officials had the power and opportunity to exercise direct control over and supervision of their subordinates. It avers further that these officials, acting "intentionally, deliberately and maliciously," exercised their authority in concert with the subordinates with the aim of injuring plaintiffs. The complaint states that the supervisors had knowledge of the subordinates' activities, gave their consent, and actually directed and supervised performance of the wrongful acts. One can contemplate a more specific set of allegations—e. g., a detailed recitation of each supervisor's instructions as to how to injure each of the plaintiffs—but such detail is not required under federal notice pleading. The complaint was signed by counsel, and, under Federal Rule of Civil Procedure 11, "[t]he signature of an attorney constitutes a certificate by him that he has read the pleading [and] that to the best of his knowledge,

---

**24.** *Hall v. Pennsylvania State Police,* 570 F.2d 86, 89 (1978); *Rotolo v. Borough of Charleroi,* 532 F.2d 920, 922–23 (1976); *Curtis v. Everette,* 489 F.2d 516, 520–21 (1973), *cert. denied,* 416 U.S. 995 (1974); *Esser v. Weller,* 467 F.2d 949 (1972) (per curiam); *Gray v. Creamer,* 465 F.2d 179, 182 n. 2 (1972); *Robinson v. McCorkle,* 462 F.2d 111, 113, *cert. denied,* 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 492 (1972); *Gittlemacker v. Prasse,* 428 F.2d 1, 6 (1970); *Kauffman, supra,* 420 F.2d at 1275–76; *Rodes v. Municipal Auth. of Borough of Milford,* 409 F.2d 16 (per curiam), *cert. denied,* 396 U.S. 861, 90 S.Ct. 133, 24 L.Ed.2d 114 (1969); *Negrich v. Hohn,* 379 F.2d 213 (1967).

information, and belief there is good ground to support it." Since "wilful violation" of this rule may subject an attorney to "appropriate disciplinary action," I assume that the allegations are made in good faith. The complaint sufficiently asserts some sort of direct involvement by the supervisory officials in what the complaint discloses to be a sordid scheme to infringe civil liberties; it passes, although barely, the test of civil rights pleading, and it will not be dismissed. More detail may be sought in discovery and the sufficiency thereof may be tested by summary judgment procedures. Otherwise, ascertainment of the averments' veracity must be determined by the fact-finder at trial.

### D. Liability of City of Philadelphia

The City of Philadelphia contends that it cannot be held liable in this case as a matter of law.[25] Two theories of federal civil rights liability are asserted against the City. The first is statutory, under the Civil Rights Act of 1871. The second seeks to impose liability on the City for damages in an action asserted directly under the Fourteenth Amendment to the Constitution.

As its wording makes clear, the Civil Rights Act of 1871 (particularly 42 U.S.C. § 1983) imposes liability only on "persons". In *Monroe v. Pape*, 365 U.S. 167, 187–92, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the Supreme Court reviewed the legislative history of the Act and concluded that Congress did not intend to include municipalities within the meaning of the word "persons" so as to subject them to liability. The Court reaffirmed that holding in later decisions (*Moor v. County of Alameda*, 411 U.S. 693, 706–10, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); *City of Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); *see also Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413,

49 L.Ed.2d 276 (1976)), and its holding was interpreted to have general application to states and their subdivisions (*e. g., United States ex rel. Gittlemacker v. County of Philadelphia*, 413 F.2d 84, 86 & n. 2 (3d Cir. 1969), *cert. denied*, 396 U.S. 1046, 90 S.Ct. 696, 24 L.Ed.2d 691 (1970)). In view of that holding, plaintiffs did not forcefully advocate their statutory claim when they filed their brief in this case. After the briefs were filed, the Supreme Court decided *Monell v. Department of Social Services*, 436 U.S. ——, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), in which it reconsidered the 1871 Act's legislative history and concluded that it had erred in *Monroe* and that governmental entities indeed could be liable "persons" under the Act. In light of *Monell*, the statutory claim against the City is resurrected, and it will be considered even though it was not advocated in plaintiffs' brief.

The core of the *Monell* opinion was the following passage:

"Our analysis of the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies. Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments,

---

**25.** As was the case with the "color of law" argument discussed in Part V.A. of this opinion, this contention erroneously has been labelled "jurisdictional." Jurisdiction for the statutory claim is based on 28 U.S.C. § 1343, quoted at note 8, *supra*. Jurisdiction for the Fourteenth Amendment claim is based on 28 U.S.C. § 1331(a), which provides—

"The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States. . . ."

The City's contention focuses on the merits rather than jurisdiction, and it will be addressed accordingly.

like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels. . . .

On the other hand, the language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.

. . . . .

We conclude, therefore, that a local government may not be sued for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."

436 U.S. at ——, 98 S.Ct. at 2035–36, 2038 (emphasis in original; footnotes omitted).[26]

The question, then, is whether plaintiffs' allegations against the City contain the "touchstone" identified by the Court: "an allegation that official policy is responsible for a deprivation of rights." A survey of the complaint discloses nothing approaching such an allegation. Rather, the complaint makes clear, and plaintiffs' brief confirms, that the only theory asserted against the City is *respondeat superior*, the theory specifically foreclosed by *Monell.* I therefore

hold that plaintiffs may not maintain an action against the City of Philadelphia under the Civil Rights Act of 1871.

The other theory advanced by plaintiffs is that the City is liable for damages in an action asserted directly under the Fourteenth Amendment. Again, the asserted basis for such liability is *respondeat superior.* When *Monroe v. Pape* was still a viable precedent, the direct Fourteenth Amendment action was commonly asserted by civil rights plaintiffs as a means of circumventing the municipal exclusion from liability which had been read into the statute. At that time, in *Jones v. McElroy,* 429 F.Supp. 848, 853–60 (E.D.Pa.1977), I held that such a theory could not be asserted against governmental entities, primarily because it would conflict with the civil rights enforcement scheme established by Congress, including the rule of *Monroe.* I followed that holding in a series of cases decided after *Jones.* See *Milburn v. Girard,* 429 F.Supp. 865 (1977); *D'Angelo v. Mishak,* 429 F.Supp. 869 (1977); *Flesch v. Eastern Pennsylvania Psychiatrict Institute,* 434 F.Supp. 963, 976 (1977); *McKnight v. Southeastern Pennsylvania Transportation Authority,* 438 F.Supp. 813, 816–17 (1977) *appeal docketed,* No. 77–2563 (3d Cir., Dec. 13, 1977); *Schweiker v. Gordon,* 442 F.Supp. 1134, 1137 (1977); *Croswell v. O'Hara,* 443 F.Supp. 895, 898 (1978). *Monell* has altered the present understanding of the Congressional enforcement scheme. In so doing, it also has altered the need to resort to the Fourteenth Amendment theory to circumvent the scheme's strictures. Henceforth, the theory need not be asserted every time relief is sought against municipalities or other governmental entities, since such defendants now can be sued under the Civil Rights Act; instead, the theory's utility has been limited to those cases in which, under *Monell,* liability still may not be imposed on

**26.** As Justice Stevens noted in a separate opinion (436 U.S. at ——, 98 S.Ct. at 2047), the Court's statements limiting municipal liability to conduct traceable to official policy and foreclosing liability based on *respondeat superior* were not necessary to decision of the case. Nevertheless, those statements were joined by

six members of the Court and two other members, in a dissenting opinion, expressed views that certainly were not hostile to the limitations on municipal liability stated by the Court. The dicta therefore is persuasive authority as to the scope of municipal liability under the Civil Rights Act and I shall follow it.

governmental entities and the plaintiff wishes to circumvent *Monell*'s restrictions. This is such a case. The question presented is whether the City of Philadelphia should be held liable for damages under the Fourteenth Amendment where the only theory of liability—*respondeat superior*—has not been permitted by Congress as its legislative intent has been interpreted in *Monell*.

█ In light of *Jones*, the answer to that question is clear. If a Fourteenth Amendment action was impermissible because it would circumvent the rule of *Monroe*, it is equally impermissible if it circumvents the rule of *Monell*. Indeed, the result is more easily reached in this case than in *Jones*. One of the arguments made in *Jones* and like cases was that the *Monroe* rule should not be relied on to deny recognition of a Fourteenth Amendment action since it was based on a dubious interpretation of legislative history which should not be entitled to much weight. *See* 429 F.Supp. at 859–60; *cf. Monell*, 436 U.S. at ——, 98 S.Ct. at 2047 (Powell, J., concurring). In light of the extensive reexamination of that legislative history in *Monell* (*see* 436 U.S. at ——, 98 S.Ct. at 2022–38), such an argument cannot be made in this case. Another factor considered in *Jones* was the possible inadequacy of the remedy provided civil rights plaintiffs by Congress. 429 F.Supp. at 860. As reinterpreted in *Monell*, § 1983's statutory remedy has been broadened to include imposition of liability on municipalities, thereby further reducing the potency of this factor insofar as it

weighs in favor of recognition of a Fourteenth Amendment action. In sum, in light of *Jones*, this is an *a fortiori* case. The will of Congress, as interpreted in *Monell*, was to exclude municipalities from liability on a *respondeat superior* theory. Such an "explicit congressional declaration" (*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 397, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *see Jones*, 429 F.Supp. at 855–56, 857) forecloses recognition of a Fourteenth Amendment action based on the same theory.

In the interim between the *Monroe* and *Monell* decisions, the question of an implied damage remedy against governmental entities directly under the Fourteenth Amendment provoked considerable disagreement in the federal courts.[27] Recently, in *Patzig v. O'Neil*, 577 F.2d 841, 850 (1978), the Court of Appeals for the Third Circuit stated in unequivocal terms that the issue is still open in this circuit. Because the issue presents an important constitutional question, however, the Court of Appeals advised that the preferred course is to avoid the issue unless it is absolutely necessary to decide it. In particular, if state law claims which are "coextensive" with the Fourteenth Amendment theory are asserted against the governmental entity, they should be decided without reaching the constitutional issue. *Patzig, supra*, at 850–51 & n. 11; *Pitrone v. Mercadante*, 572 F.2d 98 (3d Cir. 1978) (per curiam), *petition for cert. filed*, 46 U.S.L.W. 3741 (U.S., May 22, 1978)

---

27. *See Jones*, 429 F.Supp. at 856 & nn. 9–10 (citing cases); *McKnight*, 438 F.Supp. at 816–17 & n. 4. The Fifth Circuit held in broad terms that an action for damages may not be brought under the Due Process Clauses of the Fifth and Fourteenth Amendments. *Davis v. Passman*, 571 F.2d 793 (1978) (en banc). The First Circuit held that, at least in the absence of direct involvement by the municipality, a damages action against municipalities may not be asserted directly under the Fourteenth Amendment; it left open the question of equitable relief. *Kostka v. Hogg*, 560 F.2d 37 (1977). The Second and Seventh Circuits recognized actions asserted against governmental entities directly under the Fourteenth Amendment, but only if the entity was directly involved in the wrongdoing. *Turpin v. Mailet*, 579 F.2d 152

(2d Cir., June 5, 1978) (en banc); *McDonald v. Illinois*, 557 F.2d 596, 604–05 (7th Cir.), *cert. denied*, 434 U.S. 966, 98 S.Ct. 508, 54 L.Ed.2d 453 (1977). The Eighth Circuit authorized equitable relief under the Fourteenth Amendment, but left open the question of damages. *Owen v. City of Independence*, 560 F.2d 925, 932–34 & n. 9 (1977), *vacated and remanded for reconsideration in light of Monell*, 438 U.S. ——, 98 S.Ct. 3118, 57 L.Ed.2d 1145 (1978). *See generally Davis v. Passman, supra*, 571 F.2d at 807–08 n. 6 (dissenting opinion) (reviewing decisions in each circuit). My opinion in *Jones* was addressed only to the damages question, and I left open the question of equitable relief. *See Flesch*, 434 F.Supp. at 976; *McKnight*, 438 F.Supp. at 816–17; *Schweiker*, 442 F.Supp. at 1141 n. 4.

(No. 77–1666); *Mahone v. Waddle*, 564 F.2d 1018, 1025–26 & n. 8 (3d Cir. 1977), *cert. denied sub nom. Pittsburgh v. Mahone*, 438 U.S. ——, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978); *Gagliardi v. Flint*, 564 F.2d 112, 114–16 (3d Cir. 1977), *cert. denied*, 438 U.S. ——, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978). *See generally Hagans v. Lavine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *Siler v. Louisiana & Nashville R. R.*, 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909).

■ In light of the recent Third Circuit pronouncements, it appears that my decision in *Jones* was premature; I should have attempted to avoid the issue by considering pendent state claims. Be that as it may, I have confronted the issue and decided it, and I shall adhere to that decision in this case. In those cases in which the Court of Appeals remanded for consideration of the pendent state claims before decision of the constitutional issue, the trial court apparently had been confronted with the question for the first time (*e. g., Pitrone* ) or had decided the question on the basis of an erroneous interpretation of Third Circuit precedents (*e. g., Patzig* ). This case is different. My initial consideration of the question was in *Jones*, decided more than a year ago and adhered to by me since. The *Jones* decision was based on an independent analysis of the question, rather than on the view that the result was dictated by Third Circuit precedents. Although avoidance of the constitutional issue might have been the preferred course, the failure to have done so does not undermine the precedential value of the *Jones* decision. Although avoidance is a "longstanding policy" (*Elkins v. Moreno*, 435 U.S. 647, 661, 98 S.Ct. 1338, 1346, 55 L.Ed.2d 614 (1978)), it is not based on jurisdictional requirements that are prerequisites to the validity of a decision. *See Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 346–47, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (setting forth rules for "cases confessedly within

[Court's] jurisdiction"). *See generally Siler v. Louisville & Nashville R. R.*, 213 U.S. 175, 191, 29 S.Ct. 451, 53 L.Ed. 753 (1909). In light of my past decisions, I cannot pretend that the constitutional question is undecided and seek to avoid it. I remain convinced that the *Jones* decision was sound, though premature.

My holding in this case that, in light of *Monell*, a Fourteenth Amendment action may not be used to impose vicarious liability on a municipality is merely a narrower application of *Jones* to the altered legal situation under *Monell*. It does not break any new ground. I therefore see no reason to avoid this holding by hearing the state law claims against the City. Indeed, as explained in Part VI.C. of this opinion, hearing those state law claims would drastically undercut *Monell's* considered foreclosure of *respondeat superior* liability; that factor strongly weighs against use of the avoidance technique. I therefore shall follow *Jones* and hold that the City of Philadelphia may not be held liable on the civil rights claims in this case.

## VI. THE STATE LAW CLAIMS

■ In addition to their civil rights claims, plaintiffs have invoked the pendent jurisdiction doctrine to assert claims under Pennsylvania law.[28] As set forth in the complaint, these claims are "for false arrest, false imprisonment, malicious prosecution, assault and battery, trespass to real and personal property and negligent and intentional infliction of emotional distress." For reasons stated in Part V.B. of this opinion, insofar as the "false arrest" claims accrued prior to November 23, 1976, they are barred by the statute of limitations and cannot be asserted. As noted above, the complaint also asserts deprivation of "the rights secured by Sections One, Eight and Nine of Article One of the Constitution of the Commonwealth of Pennsylvania." It is

---

**28.** The complaint does not specifically use the words "pendent jurisdiction," but it does assert various claims under state law. That assertion is sufficient to invoke the pendent jurisdiction doctrine. *Cf., e. g., Andrus v. Charlestone* *Stone Products Co.*, 436 U.S. ——, —— n. 6, 98 S.Ct. 2002, 2005 n. 6, 56 L.Ed.2d 570 (1978); *Cervase v. Office of the Federal Register,* 580 F.2d 1166, 1170 (3d Cir., 1978).

unclear whether plaintiffs are asserting separate state law claims based on these deprivations and, if they are, by what authority they seek to do so.

Plaintiffs seek to hold the City of Philadelphia liable on the state law claims on the theory of *respondeat superior*, since the City employed all of the other defendants who committed the alleged wrongs. Until 1973, municipalities such as Philadelphia could not be held liable on these claims because they possessed "governmental immunity" under Pennsylvania law. That immunity has been abolished. *See Ayala v. Philadelphia Board of Public Education*, 453 Pa. 584, 305 A.2d 877 (1973).[29]

Especially insofar as they are asserted against the City of Philadelphia, the pendent claims raise intricate questions of federal jurisdiction. I therefore shall briefly outline the rules relating to pendent jurisdiction before discussing their application to this case.

### A. General rules

The pendent jurisdiction doctrine allows federal adjudication of claims not otherwise within a federal court's jurisdiction if those claims are part of the same "case" as other claims within federal jurisdiction. The doctrine's underlying rationale is that it is more economical and fairer to the parties to have all related claims litigated in a single proceeding than to fractionalize a case by having different claims litigated in different forums. *See, e. g., Hagans v. Lavine*, 415 U.S. 528, 545–46, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). Application of the doctrine requires a two-part inquiry. The first question is whether the federal court has power to hear the state law claims asserted. The second is whether the court should hear those claims in the exercise of its discretion. *See Moor v. County of Alameda*, 411 U.S. 693, 711–12, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973).

The question of power has a number of aspects. The first is that at least one of the claims asserted must be within the jurisdiction conferred by Congress. The entire theory of pendent jurisdiction is that, for the sake of convenience, claims outside federal jurisdiction are heard together with claims already within federal jurisdiction; obviously, this theory has no application if no claim is within federal jurisdiction in the first place. The test of whether a claim is within federal jurisdiction is set forth in Part V.A. of this opinion; it involves whether the claim so lacks substance that it cannot confer subject matter jurisdiction because it is foreclosed by Supreme Court precedents. *Hagans, supra; Goosby v. Osser*, 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973).

If there is a federal claim, the inquiry focuses on whether the scope of the "case" of which that claim is a part is broad enough to allow adjudication of claims not within federal jurisdiction. Initially, this inquiry depends on constitutional considerations. Article III, § 2 of the Constitution limits federal judicial power to adjudication of "cases" or "controversies", and if the claims outside of federal jurisdiction are not a part of the same "case" as those within the jurisdiction, they may not be heard on the authority of that jurisdictional grant. Generally, the test for this requirement is whether all of the claims "derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Beyond this constitutional question, however, is that of the scope of the statutory jurisdictional grant. The statute conferring jurisdiction over the federal claim may expressly or impliedly restrict the scope of the cause of action that may be litigated under it, precluding litigation of a complete "case", in the constitutional sense. This is especially true with respect to statutory restrictions on parties who may be sued. In ascertaining pendent jurisdictional power, therefore, "the reach of the statute conferring jurisdiction should be construed in light of the scope of the cause of action as to which federal judicial power *has* been extended by Congress." *Aldinger v. Howard*, 427 U.S. 1,

---

**29.** *Philadelphia already had waived the immunity.* Phila.Code § 21–701.

17, 96 S.Ct. 2413, 2421, 49 L.Ed.2d 276 (1976) (emphasis in original); *see Owen Equipment and Erection Co. v. Kroger,* 437 U.S. ——, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978).

If there is power to hear the claims not otherwise within federal jurisdiction, the court must decide whether it should exercise its discretion to hear those claims. The Supreme Court outlined considerations pertaining to this question in *Gibbs, supra:*

"That power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them, *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals. There may, on the other hand, be situations in which the state claim is so closely tied to questions of federal policy that the argument for exercise of pendent jurisdiction is particularly strong. . . . Finally, there may be reasons independent of jurisdictional considerations, such as the likelihood of jury confusion in treating divergent legal theories of relief, that would justify separating state and federal claims for trial, Fed.Rule Civ.Proc. 42(b). If so, jurisdiction should ordinarily be refused."

383 U.S. at 726–27, 86 S.Ct. at 1139 (footnotes omitted).

The Court has cautioned that "pendent state law claims are not always, or even almost always, to be dismissed and not adjudicated. On the contrary, given advantages of economy and convenience and no unfairness to litigants, *Gibbs* contemplates adjudication of these claims." *Hagans, supra,* 415 U.S. at 545–46, 94 S.Ct. at 1383. On the other hand, it has recognized that district courts have "broad discretion" on this matter. *Moor, supra,* 411 U.S. at 716, 93 S.Ct. 1785.

**B.** *The pendent claims in this case*

■ Assertion of the pendent claims against the City of Philadelphia presents special problems that will be discussed in the next segment of this opinion, but application of those claims to the other defendants presents little difficulty. A substantial federal claim is asserted against those defendants under the 1871 Civil Rights Act and there is jurisdiction over that claim under 28 U.S.C. § 1343. The state claims arise out of the same events as those giving rise to the federal civil rights claim and there is nothing in the federal statutes constricting jurisdictional authority to hear the state law claims against the individual defendants. I therefore have jurisdictional power to hear these claims.

Adjudication of the state and federal claims together will promote judicial economy and fairness to the litigants. The only countervailing consideration is "the likelihood of jury confusion in treating divergent legal theories of relief." *Gibbs,* 383 U.S. at 727, 86 S.Ct. at 1139. As noted in Part V.B. of the opinion, the claims of false imprisonment, malicious prosecution, and assault and battery are closely analogous to the federal civil rights claims. In addition, the claims of trespass to realty and personalty and intentional infliction of mental distress also are closely related to the civil rights claims, both with respect to factual proof and legal theory. The only pendent claim which is of a different category is that for "negligent infliction of emotional distress."

I previously have stated that negligence theories are "inconsistent and incompatible" with civil rights claims and can confuse the jury. *Jones v. McElroy*, 429 F.Supp. 848, 864–65 (E.D.Pa.1977). In this case I see little basis in the allegations for application of a negligence theory, and I doubt that it adds much to the case. In view of the theory's limited utility in this case and the possibility of jury confusion, jurisdiction will not be exercised over the negligence claims. I will hear all of the other state law claims.

### C. *Application of the pendent claims to City of Philadelphia*

█ With respect to the pendent claims against the City, the analysis is more complex. First, there is the question of power. The explicit statement in *Monell* that *respondeat superior* liability may not be asserted against municipalities in 1871 Civil Rights Act claims appears to deprive that statutory claim against the City of so much substance that it cannot support federal jurisdiction under 28 U.S.C. § 1343, which is more or less coterminous with the scope of the 1871 Act. *See generally Goosby v. Osser*, 409 U.S. 512, 518–19, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973). The state law claims thus can be heard, if at all, only as pendent to the civil rights claims asserted directly under the Fourteenth Amendment, using 28 U.S.C. § 1331 as a jurisdictional basis. Although I have held that municipalities may not be sued directly under the Fourteenth Amendment on a *respondeat superior* theory, the question has not been decided by the Supreme Court and the Fourteenth Amendment claim therefore is not insubstantial in a jurisdictional sense. *See Gagliardi v. Flint*, 564 F.2d 112, 114–16 (3d Cir. 1977), *cert. denied*, 438 U.S. ——, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978). The state law claims arise out of the same facts as those forming the basis for the Fourteenth Amendment claim, and the scope of § 1331's jurisdictional grant is not so limited as to exclude this type of claim against the City. I therefore have power to hear these pendent claims against the City of Philadelphia.

█ Since the claims against the City only involve application of the *respondeat superior* doctrine to liability determinations against the individual defendants, hearing these claims at this time will promote economy and fairness without presenting substantial problems of divergent theories of relief. Other considerations militate against hearing these claims against the City, however. First, there is the admonition in *Gibbs* that "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." 383 U.S. at 726, 86 S.Ct. at 1139 (footnote omitted); *see Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 196 (3d Cir. 1976). More important, however, is the reason for dismissal of the federal claims against the City. As explained in Part V.D. of this opinion, the primary reason for rejection of the Fourteenth Amendment theory is that it circumvents the civil rights enforcement scheme established by Congress, which prohibits federal litigation of this type of *respondeat superior* claim against municipalities. *See Jones v. McElroy*, 429 F.Supp. 848, 855–60 (E.D.Pa.1977). Allowance of federal litigation of these state law claims against the City would have the same result; it would negate the Supreme Court's recent judgment that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort" (*Monell v. Department of Social Services*, 436 U.S. ——, ——, 98 S.Ct. 2018, 2036 (1978)). I believe that this is an important factor to consider in deciding whether to exercise my discretion to hear these claims, and I conclude that this consideration is so important that I should decline to hear them.

Prior to the *Monell* decision, when the controversy over circumvention of the rule of *Monroe v. Pape*, 365 U.S. 167, 187–92, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), was at its height, it was suggested[30] that failure to

---

**30.** *Pitrone v. Mercadante*, 572 F.2d 98, 102 (Gibbons, J., concurring), *petition for cert.* filed, 46 U.S.L.W. 3741 (U.S., May 22, 1978) (No. 77–1666).

allow litigation of state law claims against municipalities could only be based on hostility to the abrogation of governmental immunity by the states, to the litigants' choice of a federal forum, or to the federal rights asserted. I disagree. Personal views on the abrogation of governmental immunity are irrelevant to this issue; one may agree that governmental entities should be subject to liability and nevertheless believe that claims against such entities should not be heard *by federal courts* in deference to the will of Congress. Since federal courts have limited jurisdiction, choice of a federal forum is available only insofar as Congress has authorized it and therefore should be considered with a sensitivity to the scope of that authorization. Hostility to federal civil rights never should form the basis for any decision by a federal court, but recognition of the judiciary's duty to protect civil liberties does not equate with a mandate to circumvent congressional policies with which a judge disagrees; loyalty to constitutional principles requires respect for the decisions of the legislature.

Deference to legislative will retains as much importance after the *Monell* decision as before it. Although the Supreme Court has reinterpreted congressional intent, it in no way has signalled that that intent should not be accorded the utmost respect and consideration. It is in deference to the will of Congress that I have decided not to exercise my discretion to hear the pendent claims against the City of Philadelphia based on *respondeat superior.*

Finally, as explained in Part V.D. of this opinion, I do not believe that recent decisions of the Court of Appeals for the Third Circuit—*Patzig v. O'Neil*, 577 F.2d 841, 850–51 (1978); *Pitrone v. Mercadante*, 572 F.2d 98 (1978) (per curiam), *petition for cert. filed*, 46 U.S.L.W. 3741 (U.S., May 22, 1978) (No. 77–1666); *Mahone v. Waddle*, 564 F.2d 1018, 1025–26, 1037 (1977), *cert. denied sub nom. Pittsburgh v. Mahone*, 438 U.S. ——, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978); *Gagliardi v. Flint, supra*, 564 F.2d at 114–16 ("the district court did not abuse

its discretion when it avoided the difficult constitutional question whether to imply a fourteenth amendment remedy in damages and proceeded instead to try the pendent state law claim")—mandate that I hear the state law claims against the City. Those cases did not address the policy considerations governing adjudication of the state claims once the issue of municipal liability under the Fourteenth Amendment has been decided. In addition, in accordance with *Gibbs* and *Moor v. County of Alameda*, 411 U.S. 693, 716, 93 S.Ct. 1785 (1973), the Third Circuit has continued to recognize that district courts possess discretion on this matter. In *Mahone*, it observed—

> "We did not hold in *Gagliardi* [*v. Flint*] that the district court *would* have abused its discretion if it had *not* exercised pendent jurisdiction. . . . Although we reverse the district court's dismissal of the pendent claims so that it may reconsider the possible exercise of pendent jurisdiction in light of our decisions in this case and in *Gagliardi*, we will not affirmatively order the district court to exercise pendent jurisdiction. Neither our decision in *Gagliardi* nor the two leading Supreme Court decisions—*Hagans v. Lavine* and *Siler v. Louisville and Nashville R. Co.*—are mandatory in nature. All three decisions speak in terms of the course a court 'usually should' take, *Gagliardi*, Maj.Op. at 114, not in terms of the route a court must always follow."

564 F.2d at 1026 (emphasis in original). In *Patzig*, it repeated that "[w]e do not, and cannot of course, affirmatively order the district court to exercise its pendent jurisdiction." 577 F.2d at 851.

I conclude that I should exercise my discretion not to hear the state law claims against the City of Philadelphia. Those claims will be dismissed.